Summers, J.
delivered the opinion of the majority of the court.—This cause has been fully and ably discussed, and under other circumstances the judges would have adverted more fully to the reasonings and illustrations which have been submitted to them, and to the authorities to which their consideration has been directed. The time necessarily occupied in a careful examination of the leading principles relied on, has, however, left them but a limited space for embodying their decision, with some of the prominent considerations by which they have been governed; and they therefore content themselves with shortly announcing the conclusions at which they have arrived after a very careful examination of the whole case.
The Fauquier and Alexandria turnpike company, even with the aid of the government subscription to their capital, found their road incomplete, and their resources inadequate to the repayment of money borrowed and expended in the construction of the work; and in the winter of 1828-9 applied to the general assembly for permission to raise 30,000 dollars by a lot *721 tery. This application resulted in the act of the 30th January 1829, authorizing certain commissioners therein named to contract with fit and proper persons for managing and conducting the lottery or lotteries, and for raising thereby the sum of money before mentioned, to be applied to the improvement and repair of the road.
The expediency and moral propriety of raising money for public purposes by means of lotteries, at all times questionable, seems to have attracted legislative consideration in 1834, and to have resulted in a change of the course of our public policy in relation to lotteries, giving rise to the act of the 25th of February 1834. By this act, the drawing of lotteries and the selling of lottery tickets within the state, after the 1st of January 1837, are prohibited under heavy penalties ; with a proviso in favour of lotteries for the drawing of which contracts had been previously made, leaving all such lotteries and the drawings thereof to be governed by the preexisting laws; and a second proviso, declaring that nothing contained in the act should be construed to extend to or interfere with any contract subsequently made for the drawing of any previously authorized lottery, if the drawing thereof should not extend beyond the first of January 1840. The lottery authorized on behalf of the Fauquier and Alexandria turnpike company, falling within the terms of the latter proviso, might, according to the provisions of the act, be contracted for and drawn in one or more lotteries or classes, until the sum of 30,000 dollars was raised by the commissioners for the improvement and repair of the road; provided these operations did not extend beyond the 1st of January 1840.
- From the resignation of two of the commissioners, no measures were taken for the execution of the act of the 30th January 1829, until the 11th of March 1834, fourteen days after the passage of the prohibitory act; when the same legislature, by an act of that date, ap *722 pointed commissioners in place of those who had resigned, and authorized the executive to fill any vacancies that might subsequently occur.
It is earnestly and ingeniously contended that the provisions of the act of March 1834 are repugnant to those contained in the act of the 25th of the previous month, in this, that the appointment of the new commissioners, and the power given to the executive to fill subsequent vacancies in their number, are equivalent to the reenactment of the act of 1829 with the new provisions incorporated therein; which, forming a grant of the lottery right without limitation of time as to the exercise of it, are repugnant to and operate a repeal of the provisions in the act of February 1834, limiting the exercise of the right to the first of January 1840.
The constructive repeal of statutes is in all cases to be avoided, where the legislative intendment may be otherwise satisfied, and the supposed repugnancy reconciled by a construction giving effect to both. These two statutes, enacted by the same lawgivers within two weeks of each other, present a case which strikingly imposes this duty upon the court. We think the duty performed by regarding the last statute as reviving, under the limitation as to time prescribed by the former, the original statute of 1829; thus giving to the turnpike company the full benefit of their lottery privilege for nearly six years, and forbidding its exercise beyond that period. This restriction of the right in point of time is, we think, no more than an application of the ordinary legislative power of limiting the exercise of even vested and ascertained rights, where the public weal or the safety of society may require it. If this construction reconciling the provisions of those acts were doubtful, we should find a strong motive for its adoption, in the necessity of recognizing in the legislature the power to correct improvident and sometimes injurious enactments, where they may not have ripened into contracts, *723 or resulted in the investment of rights which cannot be invaded without perfidy or bad faith.
The contemporaneous and subsequent acts regulating the licensing of the venders of lottery tickets, and imposing taxes upon them, cannot, as contended, operate a repeal of the act of February 1834, as the sale of tickets in lotteries the drawing of which had been contracted for before that date, and of tickets in foreign lotteries, was and yet is authorized by law, and the sale of other descriptions of lottery tickets only became unlawful after the 1st of January 1840 ; leaving to the keepers of lottery offices a field of operation to which the license and tax laws applied. And the increased rates of taxation on such licenses, instead of furnishing any implication of the legislative intent to abandon the policy of the restraining act of February 1834, evince an increased solicitude to repress this immoral and sometimes ruinous pursuit of gain, by the requisition of heavier contributions to the treasury from the lottery offices.
The judgment of the circuit court is, however, impugned on a graver ground. It is contended that the act of the 30th of January 1829 conferred on the turnpike company a franchise under which expenditures of money were made, and formed an implied contract between the government and the company, that the latter should enjoy, unimpaired, all the rights and advantages enuring to them under the act, until they should realize under its provisions the sum of 30,000 dollars : that the act of February 1834, limiting and restraining the exercise of the rights of the company to the 1st of January 1840, impairs the obligation of this contract, and is therefore void : and that the franchise with which the company was thus invested, entered into and became a part of the property of the corporation, of which, under the constitution of Virginia, they could not be deprived without just compensation. This argument sub *724 rnits to this court the solemn duty of comparing the provisions of the act of February 1834 with the paramount law, and of pronouncing whether those provisions are void or valid. This important judicial function, which results from the structure of our government, is, happily for the country, not often called into action ; but when demanded by the occasion, it will be exercised with firmness, and' the question considered with the care and deliberation called for by its importance.
In deciding this case, it becomes necessary to consider the nature and quality of the franchise, if it be one, which is granted to the turnpike company by the act of January 1829.
A franchise may consist in personal privilege or exemption, or in rights or privileges connected with personal or real estate; and in the latter aspect it is a species of incorporeal hereditament. The one under consideration may be properly characterized as a liberty or license to effect a particular purpose by prescribed means; which may or may not, at particular periods of its existence, and by reason of the rights and immunities which have sprung from its exercise, give rise to an implied contract or obligation for preserving it, and guarding it from injurious modifications, or become an element of private property, beyond the reach of the power of government, without due compensation. In looking into the inception and qualities of this privilege or license, it is found that the company had borrowed money for the construction and repair of the road, which circumstance formed, among others, an inducement to apply for a lottery; yet the act directs that the funds to be raised thereby shall be appropriated to the improvement and repair of the road. It is stated in the verdict, that the company, relying on the benefit and advantages of the act of January 1829, did, prior to the 25th of February 1834, enter into contracts and in *725 cur debts for the erection and completion of their road, expecting and intending to raise money for the payment thereof by the lottery: but whether these are inconsiderable amounts referred to for the purpose of giving colour, or amounts of sufficient magnitude necessarily to couple the lottery privilege with their security and payment, does not appear. Be this as it may, however, about five years elapsed without any successful attempt to render the lottery effective; and then the only measure was the act appointing two new commissioners, by which the company was again placed in a situation to render its privilege available. Five years more rolled on, when, within eleven days of the time at which the act of February 1834 went into operation, the contract of the 19th of December 1839, between the commissioners and Phalen and Morris, was entered into. Throughout this whole period, the franchise, liberty, license or privilege remained, as on the day of its enactment, a naked authority to contract for and draw a lottery, and, in the opinion of the court, at no time took the form of a contract, either express or implied, or that of private property, over which the legislative power was restrained. As to the power of the general assembly to limit, change or abolish a lottery privilege whenever the preservation and inculcation of sound morals may require it, we do not find it necessary to express any opinion; being satisfied, without reference to the general power, committed to that body, of guarding the public weal, that the act of the 25th February 1834 was not in contravention of any legal right, vested in the turnpike company, and coming within the constitutional provisions on which the argument of the case has placed this question.
Separating the question from the general powers claimed on behalf of the commonwealth to reside in the legislative department of the government, to our minds it is manifest that this dormant right to draw *726 the lottery, which was revived by the act of March 18^> must be taken as subordinate to and limited by the act of the 26th of the previous month; that those , . : . ... statutes must be taken as m pan materia, and receive the same construction as if embodied in one act; that there is nothing repugnant in the provisions of the one to those of the other, when the first is taken as limiting the time within which the right under the second is to be exercised ; and that the well ascertained principles governing the construction of statutes not only authorize but require the interpretation which we have given to these contemporary acts.
There are provisions in the contract of the 19th December 1839, fully contemplating the questions now discussed, and indicating the submission of them to this court as an experiment in reference to the before mentioned statutes; but we have examined those questions without regard to the motives which may have brought this cause here, or which may carry it further; leaving our decision to be reviewed, if that power exists elsewhere.
Christian, J. dissented.
Judgment affirmed with costs.